UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
<u>MASSACHUSETTS</u>

| | |
|---|---|
| MARSHALL AND EVELYN THOMAS, <br> Plaintiffs, <br><br> v. <br><br> J.P. MORGAN CHASE BANK, N.A. & SELECT PORTFOLIO SERVICING, INC. & DEUTSCHE BANK NATIONAL TRUST COMPANY <br> Defendants | Docket No.: 1:17-cv-11149MLW |

<u>**PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**</u>

The Plaintiffs, Evelyn and Marshall Thomas, the septagenarian owners of 28 Green Street, Canton, Massachusetts, having filed this case in June of 2017, today seek a temporary restraining order to enjoin a foreclosure scheduled for October 31st, 2018. As reasons therefore, the Thomases state that they are likely to prevail on the merits of their complaint or that – at least – it would be unjust to allow the foreclosure to proceed, based on the facts and circumstances of this case, without a full evidentiary record.

<u>FACTS</u>

The facts, as established by the Verified Complaint filed back in June of 2017, are as follows:

On or around April 4th, 2012,  Chase entered into a 291 page consent judgment (herein the "Consent Judgment") with the Department of Justice related to certain loan origination and marketing practices, wherein it agreed to provide $3,675,400,000 worth of relief to consumer borrowers, see Verified Complaint ¶ 15.  Similarly, on or around November 19th, 2013, Chase entered into a separate settlement agreement with the Department of Justice related to certain loan origination and marketing practices, wherein it agreed to forgive $4,000,000,000 (four billion) dollars worth of consumer debt,

1

see Verified Complaint ¶ 16.

The Plaintiffs own a property located at 28 Green Street, Canton, Norfolk County, Massachusetts (herein the "Property").  On or around October 4th, 2005, the Thomases gave a first lien mortgage in the amount of $1,500,000 to Washington Mutual (herein the "Mortgage") see Verified Complaint ¶ 5, Exhibit A (the Mortgage). On or around July 3rd, 2009, J.P. Morgan, Chase Bank, N.A. as successor in interest from the FDIC, as receiver for Washington Mutual assigned the mortgage to DBNT, see Verified Complaint ¶ 6. On or around September 25th, 2012, DBNT re-assigned the 2005 Mortgage, together with the note it secured (herein, jointly, the "loan")  see Verified Complaint ¶ 11.

On or around September 25th, 2012, Chase executed a loan modification agreement (herein the "Modification") with the Thomases, and their son, James Thomas, who was not signatory to the loan modification, but had come on title by deed,  see Verified Complaint ¶ 12, see Exhibit B (the Modification).

On or around December 1st, 2012, the Plaintiffs received a letter from the Defendant Chase, a letter stating "We are canceling the remaining amount you owe Chase!" on Chase letterhead, and further explaining that, "…this means you will owe nothing more on the loan and your debt will be canceled, you don't need to sign or return anything for this to happen. The amount stated as canceled was $1,651,645.97, see Verified Complaint ¶ 14, see Exhibit C (the 2012 Letter). The same amount as the modified mortgage. The Thomases, who had made three regular payments described in the Modification, stopped paying the modified amounts, as the letter urged, see Verified Complaint ¶ 15.

On information and belief, the taxes on forgiven debt in the amount of $1,651,645.97, amount to approximately, $654,051.80, see Verified Complaint ¶ 38.

The Thomases were not  crazy to believe their debt had been forgiven. They were generally aware of the Consent Judgment and the Settlement Agreement, and, relying on Chases' letter of December 1st, 2012, and the 1099Cs they subsequently received, believed their loans were canceled,

see Verified Complaint ¶ 23. Moreover, the type of consumer debt to be forgiven was set forth in an "Annex 2" to the agreement, and recited that Chase would receive a dollar for dollar credit against the amount to be forgiven based on each dollar forgiven consumer borrowers on first or second lien mortgages, Verified Complaint ¶ 17

On or around June 28th, 2014, Plaintiff Marshall Thomas received a 1099-C from Chase in the amount of $1,651,645.97, see Verified Complaint  ¶ 18, see Exhibit D (the 1099-C for the first lien mortgage).

On or around May 23rd, 2014, Evelyn Thomas received a letter from Chase that it was, "canceling [her] remaining mortgage debt," on a second mortgage, encumbering the property, which it valued at $567,405.80, see Verified Complaint  ¶ 20, see Exhibit E (the 1099-C on the second lien mortgage). On or around May 29th, 2014, Chase filed a record discharge of the same second mortgage encumbering the Property, see Verified Complaint  ¶ 19.  On information and belief, the taxes on forgiven debt in the amount of $567,405.80, amount to approximately, $224,692.70, see Verified Complaint ¶ 37.

On or around September 11th, 2014 – unbenknownst to the Thomases, Chase transferred the mortgage (although not the Note) to SPS, see Verified Complaint  ¶ 21. Apparently, on or around October 20th, 2016, SPS transferred the mortgage (although not the note) to DBNT, see see Verified Complaint  ¶ 22.

In late September of 2014, shortly before it came time to file their taxes, which they expected to be high, based on the 1099Cs the Thomases received notifications from SPS that it was attempting to collect on their loan, see Verified Complaint  ¶ 25. The Thomases repeatedly attempted to contact SPS, and got nowhere, see Verified Complaint  ¶ 26. In 2015, the Thomases contacted an attorney, Peter Samaan, who requested proof that SPS held the debt, and that SPS provide more information to him about the debt,  see Verified Complaint  ¶ 27.

When SPS did not respond to his repeated telephone calls requesting more information, Mr. Samaan sent a letter on January 18th, 2016 requesting that SPS communicate with him about the Thomases' loan, and that they cease communications with the Thomases,  see Verified Complaint  ¶ 27, Exhibit F (the Samaan Letter). To the knowledge of the Thomases, and Mr. Samaan, SPS did not respond to Mr. Samaan's letter,  see Verified Complaint  ¶ 28.

Since the filing of the Complaint in this case, however, SPS has provided the Thomases with correspondence which it claims it sent to Mr. Samaan, and which Mr. Samaan has denied receiving.

Mr. Samaan did correspond with SPS's foreclosure attorney, Orlans, PC. It is clear that on April 25th, 2017, Mr. Samaan wrote to Orlans, "I need the documentation I've been asking for for almost two years. Right now I've got your client's letter forgiving the mortgage, and a report to the IRS of the forgiven mortgage amount as income to my client," see Verified Complaint, ¶ 28, See Exhibit G (the Samaan Emails).

The Thomases will only be able to pay their taxes if they can refinance the Property, or if their son can refinance the Property, and they can use the proceeds of the refinance to pay off the I.R.S.

The Property is deeply underwater, and is valued at approximately $1.3 Million dollars, see Appraisal dated September 28th, 2018, attached hereto as Exhibit H.

Absurdly, SPS has alleged that the Thomases have committed a fraud, and that the letter they received was never sent to them by Chase, see Exhibit I (the Carr letter). This could not be further from the truth, see Exhibit J. As noted in her affidavit, neither Marshall Thomas, nor Evelyn Thomas are capable of inventing the letter canceling their debt.

Furthermore, as evidenced by the correspondence attached to the Complaint, the Thomases retained the services of an attorney to help them understand what was going on, and did not file a lawsuit until it was clear that nothing would be explained to them, see Exhibit J. Moreover, the Thomases are facing substantial tax liability, and the Property will need to be re-mortgaged, or sold, in

order to pay that debt, see Exhibit J. The Thomases have not filed their taxes since receiving the 1099C

cancellation of debt notice from Chase, see Verified Complaint ¶ 18. Even if they do not prevail in this

lawsuit, they will have incurred substantial penalties, and interest, as a result of their reliance on the

1099C they received, see Exhibit J.

Rather than negotiate with the Thomases (in this case seemingly easily susceptible to

negotiation) the Defendant, Deutsche Bank National Trust Company, as Trustee for the WaMu

Mortgage Pass-Through Certificates, Series 2005-AR16 (herein "DBNT"), acting by and through its

servicing agent, Strategic Portfolio Servicing, Inc. (herein "SPS") noticed a foreclosure sale for

October 25th, 2018, see Exhibit K. The foreclosure sale has been postponed to October 31st, 2018, see

Exhibit L.

The scheduled foreclosure sale is the sale the Thomases seek to enjoin.

<u>STANDARD OF REVIEW</u>

To obtain a preliminary injunction, the plaintiff must demonstrate: "1) a substantial likelihood of

success on the merits, 2) a significant risk of irreparable harm if the injunction is withheld, 3) a

favorable balance of hardships and 4) a fit (or lack of friction) between the injunction and the public

interest," See: *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003) (citation omitted). Of

those factors, the likelihood of success on the merits "normally weighs heaviest in the decisional

scales," See: *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009).

<u>IRREPARABLE HARM</u>

Real property is inherently unique and its sale is almost always irreparable harm. "It is well-settled law

in this Commonwealth that real property is unique and that money damages will often be inadequate to

redress a deprivation of an interest in land." See: *Greenfield Country Estates Tenants Ass'n, Inc. v.

Deep*, 423 Mass. 81, 88 (1996). "It is settled beyond the need for citation, however, that a

given piece of property is considered to be unique, and its loss is always an irreparable injury." *United*

*Church of the Medical Center v. Medical Center Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982). See also

*Ocean Spray Cranberries v. Pepsico, Inc.*, 160 F.3d 58, 61 (1st Cir. 1998) ("property is considered

unique"). By this standard, if the foreclosure will be permanently depriving him of title his real

property, causing damage that is, as a matter of law, irreparable.

<u>THE PUBLIC INTEREST</u>

The public interest to the extent it bears on this case, favors the interests of the Plaintiff. This is a

private dispute between private parties over a piece of property in Canton. The Plaintiffs are willing to

pay a bond for this injunction, in the form of regular monthly payments to their attorney in precisely

the amount agreed, in the modification agreed to by the Parties in September of 2012, see Exhibit B. A

foreclosure would be met, immediately, with a *lis pendens*, and further litigation in the form of appeals

from the denial of this motion, and if the Plaintiffs lost that motion, eviction proceedings, would

absolutely follow. If a third party were to purchase the Property at the foreclosure sale, that party's

rights would also be effected. Moreover, positions between the Parties would become pitched, and a

foreclosure would prove prejudicial to an amicable resolution of this matter.

Furthermore, SPS has no interest in owning the Property – its interest in this matter is entirely

financial, see: 12 U.S. Code § 29; a bank cannot own Property. Moreover, the bond offered by the

Plaintiffs is exactly the amount the parties had agreed upon prior to the cancellation of the Plaintiffs'

mortgage.

Finally, the Defendants have allowed this matter to continue for the last six years, without

seeking a resolution. Certainly, if there were some special urgency to foreclosing on this particular

residence – SPS would have initiated foreclosure proceedings (or tried to reach a resolution to this

matter) long ago. SPS's own intransigence in responding to the Thomases' prelitigation attempts to

understand this matter clearly militates in favor of the grant of an injunction.

<u>LIKELIHOOD OF SUCCESS ON THE MERITS</u>

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." See: *In re Lernout & Hauspie Securities Litigation*, 208 F. Supp. 2D 74, 83 (D. Mass. 2002) citing:  Fed.R.Civ.P. 9(b). The particularity requirement of Rule 9(b) serves three primary purposes: "(1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a `strike suit'; and (3) to safeguard defendants from frivolous charges which might damage their reputations," *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 289 (1st Cir.1987). The First Circuit has been "especially strict in demanding adherence to Rule 9(b) in the securities context...." Where an allegation of fraud is based only on information and belief, the complaint must set forth the source of the information and the reasons for the belief. *See Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir.1991). In short, a claim of fraud must "set forth specific facts that make it reasonable to believe that defendant [or in this case the Plaintiff] knew that a statement was materially false or misleading," *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1223-24 (1st Cir.1996) (citations omitted). Furthermore, for the Defendant's allegation to succeed, this Court would need to find that the Plaintiffs had committed fraud on this Court. "A `fraud on the court' occurs where it can be demonstrated, **clearly and convincingly**, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense," See: *Trans Health Management, Inc. v. Nunziata*, (Fla: Dist. Court of Appeals, 2nd Dist. 2014) citing: *Aoude v. Mobil Oil Corp.*, 892 F. 2d 1115, 1118-1119 (1st Cir. 1989). But "as the Court of Appeals for the First Circuit has emphasized, dismissal of a suit on the basis of a fraud on the court allegation is an extreme remedy, and should not lightly be engaged," See: *Kravetz v. US Trust Co.*, 941

F. Supp. 1295, 1301-1302 (D. Mass. 1996); citing: *Aoude* supra., at 1118-1119. Of course the "[c]lear and convincing proof involves a degree of belief greater than the usually imposed burden of proof by a fair preponderance of the evidence, but less than the burden of proof beyond a reasonable doubt imposed in criminal cases. It has been said that the proof must be strong, positive and free from doubt, and `full, clear and decisive." See: *Callahan v. Westinghous Broadcasting Co.*, 372 Mass. 582, 584 (1977).

That is to say, for SPS to prove that a fraud has occurred (which is the defense it appears to be claiming) it is going to have to prove that fact definitively. After all, if (as seems much more likely) Chase made some kind of mistake – the Thomases fairly relied on that mistake. And an injunction should issue.

The Defendant, SPS, sent the Plaintiffs, by and through counsel, a letter spelling out the substantive basis for their allegations of fraud, see Exhibit I (herein the "Carr letter") The Defendants' claims of fraud on the part of the Thomases can be mapped out as follows:

(1).     **The Defendants allege the Thomases doctored the letter they received from Chase, but don't conduct a thorough analysis**.
The Defendants' premise their argument that the Thomases doctored the December 1st, 2012 letter on the following facts:

(a).     Chase, or SPS, claims that the Thomases doctored a letter from September of 2012 that was sent to them to tell them of the discharge of the Second Mortgage, in the amount of $567,408.80, see Exhibit I. But that document was not received until May of 2014. But that letter does not look like the September 1st, 2012 letter, see Exhibit M.

(b).     SPS claims that December 1st, 2012, the date on the letter falls on a Saturday; and so it does. But this error seems to militate *against* the idea of fraud. As it is hard to believe someone going to

extremes to create a forgery would not also look up the date, see Exhibit N (herein the "Jacobson letter"). As noted in the Jacobson letter: forgery is an intentional act. The forger, unlike, for example, the accidental trespasser, is perfectly aware that he is creating a forgery. It is implausible that someone creating a forgery would not consider carefully the date of the letter. The same logic applies to the date provided at the bottom of the letter. First, the Thomases did not receive any letter dated September 1st, 2012; and, second, had a forgery been created, would not the forger have carefully chosen a different date?

(c).     Chase also claims that, "[i]n all Chase debt forgiveness letters sent in accordance with the Department of Justice settlement, a comma appears after the loan balance that is being extinguished in the second paragraph. Mr. Carr suggests that, "the standard comma was removed, and does not exist, apparently to permit sufficient space for the larger balance of the first loan to be inserted. But, by that logic, deleting a comma from the the balance forgiven would not make space for the extra "1" in $1,651,647.97, because that number has *both* an additional 1 <u>and</u> an additional comma in it.

While the Thomases never seen the September 1st, 2012 letter referenced in Mr. Carr's letter – there would need to have been an inordinately large space behind the $567,405.80 in order to make room for the additional, "1" <u>and</u> an additional comma. Whoever created Exhibit C would have had to edit the entire document to account for that additional, "1" and the comma – not just the single line.

Moreover, the only other debt forgiveness letter the Thomases have seen (or which has been produced to them in discovery) does not contain a loan balance in the second paragraph – of any time, see: Exhibit M.

(d).     Furthermore, the letter received by the Thomases' explaining that a debt was forgiven (the May 23rd, 2014 letter) does not contain the unique identifier described in the Carr letter.

(e).     There is still more confusion. The Carr letter alleges that, "a 1099-C would not have been issued in 2014, if the first mortgage had been forgiven in 2012 or 2013." Apparently, however, the

October 1st, 2012 date on the second page of the December 1st, 2012 letter relates to some September 1st, 2012 letter (which the Thomases have never seen). But the 1099C for that debt was sent to the Thomases for a debt discharged in June of 2014, see Verified Complaint at ¶ 19, Exhibit J.[1]

So *either* some September 1st, 2012 letter exists, and the second mortgage was forgiven in 2014, or no such letter exists, in which case the December 1st, 2012 letter is probably valid *or* there was no September 1st, 2012 letter – in which case, it does not make sense that SPS is asserting such a letter existed. The most likely alternative, was that Chase, in administering a large and probably confusing loan forgiveness scheme, mucked up some dates.

(f).   In any case, the Thomases do not know how to forge documents they receive. Chase, which generated all of the letters sent to the Thomases, may have made a mistake. But that is a far cry from an allegation that the Thomases intentionally committed a fraud.

(g).   As set forth in the Verified Complaint, the Thomases engaged a lawyer, and made numerous attempts to investigate what had happened. But Chase, or SPS, did not deal with them. The terse emailed correspondence from Orlans PC is a far cry from the kind of substantive response that undoes a million dollar mistake.

And while the Thomases, in receipt of the Carr letter, at last understand SPS' position, there is a question as to whether SPS' explanation, sent only after a half a year of litigation, has come too late for Evelyn and Marshall. The couple now face the loss of their Property, and unpaid taxes for 2014, 2015, 2016, 2017 and 2018, which they will need to find a way to pay.

Evelyn and Marshall are willing to negotiate with Chase and SPS, but they will not be able to cleanly negotiate if the Property is lost to foreclosure. And, in the absence of an injunction, that is what will happen.

Certainly, given the interests at stake, an injunction is reasonable. Absent a showing of fraud,

---

1    Due to a scrivener's error, this date is listed as May 29th, 2014, as opposed to June 29th, 2014.

Evelyn and Marshall, who received a notice that their debt was canceled (at a time when Chase actually *was* canceling debt), and a 1099-C, were entitled to rely on those documents. Since SPS will need to show fraud by *clear and convincing* evidence, more than the bald assertion of fraud is needed. The confluence of confusions associated with the alleged fraud (the need to edit the whole line to make room for the "1" and the ","; the failure of SPS to produce any September 1, 2012 cancellation of debt letter for the Second Mortgage in discovery; the fact that both 1099-Cs (for the first and the second mortgage) were issued in 2014; and the simple fact that Evelyn and Marshall are both in their 70s and without the technical skills to create a fraudulent letter of the type described by SPS) suggest that this case should go on at least long enough for the Parties to discover who sent the December 1st, 2012 letter, and why the 1099C was sent to the Thomases.

WHEREFORE, Evelyn and Marshall Thomas respectfully request this Court enter an ORDER:

(1).    Restraining the foreclosure sale set for October 31st, 2018; and

(2).    Schedule a hearing on why the Temporary Restraining Order should not become a Preliminary Injunction on or before November 7th, 2018.[2]

Respectfully Submitted,
Marshall and Evelyn Thomas
By their attorney,

October 26th, 2018

/S/ Jonas A. Jacobson
Jonas A. Jacobson (BBO #676581)
872 Massachusetts Ave., Unit 1-6
Cambridge, MA 02139
617.230.2779
jonas@jonasjacobson.com

---

2    As noted in connection with other cases pending in this Court, Plaintiff's counsel's wife is due on November 13th, 2018, and he respectfully requests a hearing on the injunction prior to this date.

**CERTIFICATE OF SERVICE**

I, Jonas A. Jacobson, hereby certify that the documents filed through the ECF system will
be sent electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non registered participants on October 26th,
2018

/s/ Jonas A. Jacobson

**CERTIFICATION PURSUANT TO LOCAL RULE 7.1(A)(2)**

In accordance with Local Rule 7.1(a)(2), I, Jonas A. Jacobson, do hereby certify that I conferred with
Defendant's counsel regarding this Motion.

/s/ Jonas A. Jacobson
Jonas A. Jacobson